**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

DANIEL COCANOUR and DALE RIMKUS,
on behalf of all those similarly situated,

                               Plaintiffs,

       v.

NATIONAL SHOOTING SPORTS
FOUNDATION, INC.

                            Defendant.

Civil Action No. 3:25-cv-1571

September 22, 2025

**<u>COMPLAINT</u>**

## I.    INTRODUCTION

1.    Privacy is important to firearms purchasers. Many firearms purchasers seek to protect themselves from a dangerous ex-partner. Many others are in law enforcement. Still others value privacy simply as part of "the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting).

2.    Firearms purchasers want to control who can and cannot know a slew of personal information—*e.g.*, their address and phone number, whether they are married or have children, their income level, or their personal habits or hobbies. And even when they decide to give sensitive personal details to another party, they want to know the purposes for which that information will be used and to whom (if anyone) it can be disclosed.

3.    Privacy enables the exercise of constitutional rights. The First Amendment right "to receive information and ideas," *Kleindienst v. Mandel*, 408 U.S. 753, 562 (1972) (citation omitted), would be drained of value if members of the public had to relinquish their individual privacy before they could receive controversial information and ideas.

4.    Similar reasoning holds true for the Second Amendment. The Supreme Court has held that the Constitution gives law-abiding citizens a robust individual right to possess and carry firearms. *See generally N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). If law-abiding citizens were not able to purchase firearms without also relinquishing their privacy, the right recognized by the Supreme Court would be far more difficult to exercise.

5.    This case arises from an organization's decision to disregard the privacy, and misuse the sensitive information, of millions of law-abiding firearms purchasers.

6.      That organization is the National Shooting Sports Foundation ("NSSF"). NSSF, which describes itself as the "trade association for the firearms industry," insists that it cherishes and wants to protect the privacy of firearms owners.

7.      For example, NSSF celebrated the February 23, 2024, introduction into the U.S. House of Representatives of a bill called the "Protecting Privacy in Purchases Act." If enacted, NSSF said, the bill would protect the "privacy of firearm and ammunition purchasers" by preventing banks and credit card companies from "compiling [buyers'] purchase history," which "has already proven to be exploited by the federal government for political purposes."[1]

8.      Later in 2024, NSSF hailed a separate Senate bill also called the "Protecting Privacy in Purchases Act." The legislation, NSSF's General Counsel said, "would protect the private financial data of citizens exercising their Constitutional rights to keep and bear arms."[2]

9.      NSSF has also celebrated state laws that "protect[] the privacy and sensitive financial information of people purchasing firearms and ammunition," including laws that "prohibit[] keeping or causing to be kept any list, record or registry of private firearm ownership."[3]

10.      But while NSSF talks the talk about privacy, it does not walk the walk. Over an extended period, NSSF convinced many firearms manufacturers and retailers to send it firearms purchasers' warranty cards, which contain sensitive and private information on household

---

[1] NSSF, *NSSF Hails Introduction of Rep. Elise Stefanik's Protecting Privacy in Purchases Act* (Feb. 23, 2024), https://www.nssf.org/articles/nssf-hails-introduction-of-rep-elise-stefaniks-protecting-privacy-in-purchases-act/ [https://perma.cc/7SV3-AYV9].

[2] NSSF, *NSSF Welcomes Sen. Hagerty's Protecting Privacy in Purchases Act Introduction* (Apr. 9, 2024), https://www.nssf.org/articles/nssf-welcomes-sen-hagertys-protecting-privacy-in-purchases-act-introduction/ [https://perma.cc/4JCW-C6VK].

[3] NSSF, *NSSF Praises Ohio Gov. Mike DeWine for Signing Second Amendment Privacy Act* (Jan. 13, 2025), https://www.nssf.org/articles/nssf-praises-ohio-gov-mike-dewine-for-signing-second-amendment-privacy-act/ [https://perma.cc/6JBX-DQBR].

composition, income, lifestyle, and other matters. Out of this information, NSSF created a database of millions of firearms purchasers, whom NSSF then targeted with political messages.

11.     Firearms purchasers did not know that firearms manufacturers or retailers would transfer their personal information to NSSF. Nor did they agree to or authorize such a transfer. They did not know that NSSF would use their personal information for political purposes, much less authorize NSSF to do so. In fact, until very recently, nobody outside NSSF and the relevant firearms manufacturers or retailers had the slightest idea about these practices, because the relevant actors concealed them.

12.     At this point, unfortunately, it may be impossible to restore the privacy of the millions of firearms purchasers whose private information NSSF received and used without the purchasers' prior knowledge and consent.

13.     Private information of the kind that NSSF received and used here, however, has quantifiable value for political actors. NSSF benefited from receiving firearms purchasers' private information and not having to pay for it. To the extent this action cannot undo what NSSF has done, it can at least compel NSSF to pay firearms purchasers for the value of what it took without permission. That is the goal of this action.

## II.     JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy, exclusive of interest and costs, exceeds the sum of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists as Defendants are citizens of a State different from that of at least one Class Member.

15.     This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because all Plaintiffs are citizens of a different State than Connecticut, the State in which NSSF is headquartered and incorporated.

16.     This Court has personal jurisdiction over the National Sports Shooting Foundation because it is headquartered in this District, has been headquartered in this District at all relevant times, and is incorporated in Connecticut.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District. Venue is also proper because the Defendant resides in this District and because the Court has personal jurisdiction over the Defendant.

### III.     PARTIES

18.     Defendant National Shooting Sports Foundation ("NSSF") is, on information and belief, a nonprofit corporation incorporated under the laws of Connecticut. It was founded in 1961. Initially headquartered in Riverside, Connecticut, it moved its headquarters to Wilton, Connecticut in 1988. In 1993, it purchased a 20,000-square-foot building in Newtown, Connecticut for its headquarters. NSSF remained in Newtown until 2022, when it moved its headquarters to Shelton, Connecticut, where it remains as of the filing of this complaint. NSSF describes itself as the "trade association for the firearms industry," and states that its mission is to "promote, protect and preserve hunting and the shooting sports." It claims to follow that mission by "stand[ing] in defense of every segment" of the firearms industry "on Capitol Hill and in state capitols nationwide." It says it also provides "reliable industry research and analysis" to its members, uses "multiple communication platforms to educate, inform and persuade today's key audiences on the industry's behalf," and sees itself as "[e]ducating the [m]asses" on a variety of firearms-related issues.

19. Plaintiff Daniel Cocanour resides and has his home in Oklahoma. He has purchased some firearms for personal protection and others for hunting. He is a skilled and experienced user of firearms and in the past has successfully competed in practical shooting matches. He has purchased numerous firearms over the years, as detailed later in this complaint.

20. Plaintiff Dale Rimkus resides and has his home in Illinois. He began hunting with his father and brothers at an early age and has done so ever since. He has purchased numerous firearms over the years, as detailed later in this complaint.

## IV.    FACTUAL ALLEGATIONS

### A.    1990s: The Database Is Born

21. In the early 1990s, firearms manufacturers and industry groups were looking for an effective way to resist a trend toward increased firearms regulation.

22. On information and belief, it was in 1990 or 1991 that one industry lobbyist, Richard Feldman, asked one of his clients, Intratec, for the firm's warranty cards.

23. Warranty cards are filled out by consumers and returned to gun manufacturers in exchange for rebates and repair or replacement programs. The warranty cards typically not only capture contact information, but also allow the manufacturer to understand the characteristics of the consumer, such as gender, age, socioeconomic background, and interests. Questions on warranty cards often ask about purchasers' annual family income, what sort of vehicle they own, and why they purchased the firearm. They sometimes ask for highly personal information as well. Here, for example, is a question from a Bushnell warranty card:

**24.** **Which of the following do you plan to do within the next 6 or 12 months?**

|  | 1-6 Months | | 7-12 Months |
|---|---|---|---|
| Get Married............................................ | ☐ | 1. | ☐ |
| Have a Baby .......................................... | ☐ | 2. | ☐ |
| Buy a House .......................................... | ☐ | 3. | ☐ |
| Remodel a Home ................................... | ☐ | 4. | ☐ |
| Move to a New Residence...................... | ☐ | 5. | ☐ |
| Buy a Personal Computer ...................... | ☐ | 6. | ☐ |
| Buy/Lease a New Vehicle....................... | ☐ | 7. | ☐ |
| Buy/Lease a Used Vehicle..................... | ☐ | 8. | ☐ |

24.    Intratec sent Feldman boxes containing the names of more than 90,000 gun owners across the country. But Feldman and his organization did not yet have the resources to build a database from that information.

25.    In 1993, there was another push for firearms regulation that eventually resulted in a 10-year ban on the sale of assault weapons and a requirement that background checks be run on firearm purchasers. These provisions were signed into law on September 13, 1994, as part of the Violent Crime Control and Law Enforcement Act of 1994.

26.    In the mid-1990s, lobbyist Feldman shared his warranty-card idea with James Jay Baker, a lawyer who represented the firearms industry and reported directly to the president of the NSSF.

27.    Baker was excited by the idea of an industry-wide warranty card project and took steps to implement it at NSSF.

28.    By June 1997, Bushnell had given the NSSF a list of customers who had filled out warranty cards, according to a NSSF report to its members. Two months later, Baker sent a letter to firearms industry executives, stating:

> I'm told that only two companies have forwarded their database [of customer information from warranty cards], and unless we wish to rely upon other groups' efforts, this as-yet-uncompiled database will be our single greatest resource for both grassroots work and PAC development. Anything you can do to assist in the compilation effort would be greatly appreciated.

**B.    1999–2000: The Database Is Built**

29.    In response to the April 1999 shootings at Columbine High School, firearms industry executives gathered in several NSSF-convened meetings to come up with an action plan. The group eliminated NSSF's prohibition on campaigning and agreed to hire lobbyists. In late 1999, 22 executives took leadership of a new group created by the NSSF, the Hunting and Shooting Sports Heritage Foundation (HSSHF), the purpose of which "was to defend the gun industry from the legal onslaught and transform its public image."

30.    In November 1999, the NSSF board reported the following on the status of the database of firearms purchasers that it was building using information from warranty cards:

> Initial participation in the database has been very positive and we will have 400,000 names on file and available by year's end. To date, five manufacturers have supplied warranty card databases and several other manufacturers have indicated interest. One state conservation agency has offered its 1999 hunting license information if we convert it from hard copy to an electronic file. This opens up awesome opportunity and potential.

31.    The board went on to outline its plan to use the database for various purposes, including "NSSF/HSSHF fundraising efforts" and "political action." The board also proposed to make the list "available to members on a rental basis," and to "make the list available to outside companies on a rental basis," to offset the cost of data entry and maintenance. These outside companies included "non-shooting related companies and organizations."

32.    The database not only stored contact information and date of birth for firearms purchasers, but also gender, income, level of education, profession, number of firearms owned,

household size, average days afield or at range, date of purchase, and whether the purchaser was primarily a hunter or a target shooter.

33.    In the lead-up to the 2000 election, the retailer Cabela's, which sold guns and outdoor equipment, shared data on 356,000 customers with HSSHF, even though Cabela's privacy policies at the time told customers only that their postal addresses could be given to "reputable companies" to keep customers "informed of other outdoor products and manufacturers." The policy did not state that customers' information could be used for political purposes.

34.    During the 2000 election cycle, HSSHF used the Cabela's data, in conjunction with data purchased from a data broker, to target more than 2.5 million people by mail in relevant states. The NSSF later claimed in a public report that Vote Your Sport was a "critical component" of George W. Bush's presidential victory.

## C.    2000–2002: The Database Grows

35.    In the months after President Bush's victory, the NSSF expanded its database, receiving many boxes of warranty cards from participating manufacturers or retailers. On information and belief, these warranty cards spanned decades of purchases; according to a report, some of these warranty cards were "aged" and "fading" when they were entered into NSSF's database.

36.    By May 2001, the "consumer master database" contained 3.4 million records. Of those, 523,000 came from warranty cards (or "owner cards," as the document names them), and 2.9 million were acquired through voter and hunting license lists. At the time, the NSSF board stated in an internal document:

> When the building and proving phases of this project are completed (early June 2001), we will then be seeking new data sources (partners) and acquiring new data into the system. From that point on, we will continue to make the database

system as robust as is possible in terms of amount and frequency of new input. The database will be designed to support communication and interaction with consumers involved in and interest in the shooting sports. . . . By late summer we will be in a position to begin focused and targeted campaigns and surveys.

37.     By February 2002, the "master relational database"—now called "Data Hunter"— had grown to 5.5 million records. In an internal document, NSSF identified numerous industry manufacturers as contributors, including Glock, Marlin Firearms, Mossberg, Savage Arms, Sigarms, and Smith & Wesson. Other sources included Remington, Cabela's Hornady, Alliant Powder, and USA Shooting. NSSF stated that Olim Winchester and ATK Technologies were intending to join later in 2002.

**D.     2002–2016: The Database Continues**

38.     The NSSF database was used to target voters in the 2002 midterm election. This voter outreach campaign was first called "Vote Your Sport" and later became known as "GunVote."

39.     Vote Your Sport continued in the 2004 election, sending targeted political mailers like this one:



40. Similar political efforts continued in the election cycles that followed: 2006, 2008, 2010, 2012, and 2014.

41. By June 2017, NSSF's database included—but went considerably beyond—the personal information of people who had submitted a warranty card upon purchasing certain firearms brands in the prior twenty years. These brands included at least Glock, Marlin Firearms, Mossberg, Savage Arms, Sigarms, Smith & Wesson, Remington, Hornady, Alliant Powder, USA Shooting, Winchester, and ATK Technologies.

42. The database also included personal information from certain firearms purchases from at least the late 1980s.

### E.    2016: Cambridge Analytica Enters the Picture

43. Then, in April 2016, Sean O'Malley, an NSSF contractor who had run GunVote since the early 2000s, hired Cambridge Analytica to help the NSSF mobilize gun supporters in battleground states in the 2016 presidential election. Cambridge Analytica was a British political consulting firm best known for collecting the personal information of 87 million Facebook users without their informed consent. Before that scandal broke in 2018, however, Cambridge Analytica's work "was sufficiently convincing to the leading advertising industry research organization, the Advertising Research Foundation," that in 2017 it gave Cambridge Analytica an award under the "Big Data" category.[4]

44. Cambridge Analytica's 2016 campaign for NSSF had three phases.

45. First, Cambridge Analytica gathered data from various sources, including the warranty cards filled out by firearm purchasers, voter rolls, hunting licenses, and a database of Cabela's customers, all of which were combined in the NSSF database. Cambridge Analytica

---

[4] Jeff Chester & Kathryn C. Montgomery, *The Role of Digital Marketing in Political Campaigns*, Internet Policy Review, Dec. 2017, at 1, 7, https://policyreview.info/pdf/policyreview-2017-4-773.pdf.

also obtained data about consumer purchases from the data broker companies L2 and Infogroup. Comparisons between the NSSF database and the consumer data produced more than 1.3 million matches.

46.    Some data was basic demographic information, like address, occupation, gender, and marital status. But other data was more specific, including categories like "Reading Science Fiction," "Working Woman," and "Used Cents-Off Coupons at a Drug Store." Still other data categorized a person's opinions, histories, and vices, including categories like "Sometimes Carry a Balance on Credit Card," Likelihood to Have a Baby," "Shopaholics," and "Recently Divorced."

47.    For the 2016 campaign, O'Malley and Larry Keane, senior vice president of the NSSF since 2000, attempted to expand their data pool by seeking data-sharing deals with Gunbroker.com, the largest online firearms auction site in the United States, and Bass Pro Shops, one of the nation's largest sporting goods retailers. But talks with both retailers fell apart when Cambridge Analytica did not sufficiently address or accommodate the data-privacy concerns of each company.

48.    Second, Cambridge Analytica used an algorithm to profile and score each person's behavioral traits based on the data and a psychological assessment tool. Based on the scores, Cambridge Analytica organized people into five personality groups: risk-takers, carers, go-getters, individualists, and supporters. Ads were crafted for each group.

49.    For example, a "risk-taker" might have received this ad, which threatens the possibility of the United States Supreme Court turning into "an enemy to your gun rights":



50.    On the same theme, however, a "carer" might have received this ad, which depicts a happy family on a sunny day holding hands and surrounded by nature, and which highlights the politician "protecting your family's way of life":



51.     Third, Cambridge Analytica used the data to deliver such tailored ads to each group. Ads were sent out on social media platforms to hundreds of thousands of targeted voters, driving millions of views and millions of visitors to the NSSF's website. Ads were also mailed to targeted voters' homes, after Cambridge Analytica mapped out the locations of people in the five personality groups and generated lists for NSSF contractors.

## F.     Misappropriation of Customers' Personal Information

52.     A warranty card does not look the same from manufacturer to manufacturer. But they have one important commonality for purposes of this case: no relevant warranty card disclosed to product purchasers that their information would be given to the NSSF or used for political purposes.

53.     Some warranty cards promised customers that their information would be kept strictly confidential. Other warranty cards told customers that some information could be shared with third parties for marketing and sales.

54.     For example, the warranty card used by the Remington Arms Company (now split into RemArms and Remington Ammunition) told customers the following, in relevant part:

> Your answers will be used for market research studies and reports – and will help us better serve you in the future. They will also allow you to receive important mailings and special offers from a number of fine companies whose products and services relate directly to the specific interests, hobbies, and other information indicated above.

This card did not disclose that the information would be shared with the NSSF.

55.     Similarly, Cabela's privacy policy did not disclose to customers that their information would be shared with the NSSF.

56.     At all times, NSSF has concealed that it received the personal information of firearms and ammunition purchasers and that it used it for political purposes. Likewise, at all times, firearms manufacturers and retailers have concealed that they transferred the personal

information of firearms and ammunition purchasers to NSSF, knowing that it would be used for political purposes.

**G.      The Market for, and Quantifiable Value of, Private Personal Information.**

57.      A customer's personal information—including the kinds of information recorded on a warranty card—has measurable value. Such information has value in a variety of contexts, including politics and voter engagement.

58.      The market for personal information is so large that an entire industry of data brokerage is built upon it. The Federal Trade Commission has defined "data brokers" to include "companies that collect information, including personal information about consumers, from a wide variety of sources for the purposes of reselling such information to their customers for various purposes, including verifying an individual's identity, differentiating records, marketing products, and preventing financial fraud."[5] That market has continued to draw attention from analysts and policymakers.

59.      In 2013, the staff of the U.S. Senate Committee on Commerce, Science, and Transportation issued a report on the data broker industry, with a focus on the collection and sale of data specifically for marketing purposes. The report concluded that consumers are regularly generating data that is likely to end up in the hands of data brokers and amassed with other data to construct profiles of them. The report also concluded that consumers have little means to learn about or control the spread of their information in such a secretive industry.[6]

---

[5] Fed. Trade Comm'n, *Protecting Consumer Privacy in an Era of Rapid Change: Recommendations for Businesses and Policymakers* (Mar. 2012), https://www.ftc.gov/reports/protecting-consumer-privacy-era-rapid-change-recommendations-businesses-policymakers.

[6] *See generally* Staff of S. Comm. on Commerce, Sci., & Transp., 113th Cong., *A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for Marketing Purposes* (Dec. 18, 2013), https://www.commerce.senate.gov/services/files/0d2b3642-6221-4888-a631-08f2f255b577.

60.     In 2017, *The Economist* declared that "the world's most valuable resource is no longer oil, but data." The magazine observed, "Smartphones and the internet have made data abundant, ubiquitous and far more valuable. Whether you are going for a run, watching TV or even just sitting in traffic, virtually every activity creates a digital trace—more raw material for the data distilleries."[7]

61.     A 2022 report by economists at the OECD treated data (including personal information) as an asset whose value can be measured, observing that "[c]ompanies demand data and view them as one of their core intangible assets critical to business performance and to welfare enhancing growth."[8]

62.     Personal information is not just valuable to private industry. It is valuable to political actors seeking to engage and motivate voters. "For years, political campaigns have been able to combine public voter files with commercial information from data brokers, to develop detailed and comprehensive dossiers on American voters."[9] To the extent NSSF received firearms' owners private personal information for free, it did not have to buy similar information from data brokers. And some of the private personal information NSSF received was not available from data brokers at all.

63.     Politicians and political consultants soon took up many of the digital strategies, tools, and techniques for targeting and advertising first used in the commercial sector.[10] The use of personal information as part of these strategies has enhanced political campaigns' capacity to

---

[7] *The World's Most Valuable Resource Is No Longer Oil, but Data,* The Economist (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.
[8] Carol Corrado et al., Org. for Econ. Coop. & Dev. *The Value of Data in Digital-Based Business Models: Measurement and Economic Policy Implications* (Econ. Dep't Working Paper No. 1723, Aug. 30, 2022), https://one.oecd.org/document/ECO/WKP(2022)24/En/pdf.
[9] Chester & Montgomery, *supra* note 4, at 3.
[10] *Id.* at 2–3.

identify, reach, and interact with individual citizens; to reach out and appeal to small donors; and to more efficiently generate turnout.[11]

64.     For several decades now, political campaigns have been so expensive that politicians cannot afford to reach out to all voters: they must decide which voters they should try to target and which voters are not worth the expense. Using personal data about voters, however, campaigns can build a predictive models to target their communications more efficiently and support more effective strategies to drive turnout.

65.     The observed behavior of political actors by itself shows that personal data on potential voters has significant value. In 2008, the campaign of then-candidate Barack Obama purchased a special user interface in order to access "VoteBuilder," the Democratic Party's proprietary data on voters. This data was then analyzed in such a way as to target particular voters most efficiently.

66.     Democratic primary candidates have vied for the ability to access VoteBuilder, a database that gives campaigns actionable information on which donors, volunteers, or voters are most likely to donate, to get involved, and to turn out on Election Day.

67.     Similarly, the Republican Party used its voter information database to form a joint venture with an online-donation processor to increase small-dollar fundraising.

68.     Many commentators have observed that personal information has market value among political actors, and one has even suggested that citizens could be empowered to donate to "whichever organizations and causes they want to support" by sharing their data with them.[12]

---

[11] *Id.* at 4, 7–8.
[12] Philip N. Howard, *Our Data, Ourselves,* Foreign Policy (July 16, 2018, 8:00 AM), https://foreignpolicy.com/2018/07/16/our-data-ourselves-democracy-technology-algorithms.

This conceptualizes data donation as an in-kind donation, analogous to the way donors might donate their shares in a corporation to a nonprofit.

**H.    The Plaintiffs, Their Firearms Purchasers, and Their Personal Information.**

**1.    Plaintiff Daniel Cocanour**

69.    Plaintiff Daniel Cocanour has a lengthy history of legal firearms purchases. The following are the firearms he has purchased brand new.

70.    In the mid-1990s, he purchased a Winchester Model 1300 shotgun for hunting purposes.

71.    Around 1995-96, he purchased a .270 Winchester rifle manufactured by Savage Arms.

72.    In the late 1990s, he purchased a Ruger P89 pistol.

73.    In or around 2003, he purchased two Glock Model 27 handguns for self-protection purposes, one for himself and one for his wife.

74.    In or around 2005, he bought another .270 Winchester rifle—this one manufactured by Weatherby—to replace the one he had purchased in 1995-96, which had since been stolen in a home burglary.

75.    In the mid-2000s, he purchased a Remington 870 shotgun.

76.    Each of these firearms, when purchased, was accompanied by a warranty card.

77.    Mr. Cocanour's practice whenever he purchases a new firearm is to return the filled-out warranty card for that firearm or (for more recent purchases) to submit the same information online.

### 2.    Plaintiff Dale Rimkus

78.    Plaintiff Dale Rimkus has a lengthy history of legal firearms purchases.

Generally, he has purchased shotguns and rifles for hunting purposes, and handguns for target

shooting and personal protection. The following are the firearms he has purchased brand new.

79.    In the latter half of the 1980s, he purchased a Browning shotgun and a Winchester

shotgun.

80.    In the mid-1990s, Mr. Rimkus purchased Browning and Beretta handguns.

Around the same time, he purchased a Winchester rifle and a Browning rifle.

81.    In the 2000s, Mr. Rimkus continued purchasing firearms. He purchased a Colt

handgun, a Kimber handgun, and a Walther handgun during this period. He purchased a Smith &

Wesson handgun around 2007. He purchased a Ruger handgun in 2009 or 2010. And he

purchased a Winchester rifle around 2008.

82.    His purchases continued in the next decade and a half. He purchased a Remington

handgun around 2010-11, a Remington shotgun around 2012-14, a Ruger handgun in the mid-

2010s, and a Winchester shotgun in 2016-17. He purchased a CZ trap gun (a shotgun designed

specifically for trap shooting) from Cabela's in 2014-15. He also bought a Beretta handgun

during the 2010s.

83.    Each of these firearms, when purchased, was accompanied by a warranty card.

84.    Mr. Rimkus's normal practice was to fill out a warranty card and mail it in within

two or three weeks after purchasing a firearm. His attitude (until he learned of the practices

alleged in this complaint) was always that it was in his best interest to return warranty cards.

## V.    CLASS ACTION ALLEGATIONS

85.    Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs

seek certification of the following nationwide class for a claim of unjust enrichment against

Defendant NSSF:

> All natural persons residing in the United States whose personally identifiable
> information NSSF received, due to the natural person's purchase of a firearm or
> ammunition, from a manufacturer or retailer of firearms from 1990 to the present.

86.    **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the

Class are so numerous and geographically dispersed that individual joinder of all Class Members

is impractical. While the exact number of Class Members is unknown to Plaintiffs at this time,

public reporting shows that hundreds of thousands of individuals' personally identifiable

information has been shared with NSSF by firearms manufacturers and retailers. Those

individuals' names and addresses are available from the records of NSSF or firearms

manufacturers and retailers, and Class Members may be notified of the pendency of this action

by recognized, Court-approved notice dissemination methods.

87.    **Commonality: Federal Rules of Civil Procedure 23(a)(2).** This action involves

questions of law and fact common to the Class. The common questions include:

1.    Whether the relevant manufacturers or retailers of firearms were
authorized by warranty card or contract to transfer Class Members'
personal information to NSSF;

2.    Whether Class Members authorized NSSF to receive or use Class
Members' personal information;

3.    Whether NSSF benefited from the use of Class Members' personal
information;

4.    Whether NSSF unjustly failed to pay Class Members for use of their

personal information or the benefits thereof;

5.    Whether the failure of payment was to Class Members' detriment.

88.    **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are

typical of the claims of other Class Members because Plaintiffs and Class Members were

subjected to the same allegedly unlawful conduct and damaged in the same way. Plaintiffs'

damages and injuries are akin to those of other Class Members and Plaintiffs seek the same relief

as the rest of the Class.

89.    **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).**

Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class

and are committed to pursuing this matter against Defendant to obtain relief for the Class.

Plaintiffs have no conflicts of interest with the Class. Plaintiffs' Counsel are competent and

experienced in litigating class actions. Plaintiffs intend to vigorously prosecute this case and will

fairly and adequately protect the Class's interests.

90.    **Predominance and Superiority: Federal Rule of Civil Procedure 23(b)(3).** A

class action is superior to any other available means for the fair and efficient adjudication of this

controversy, and no unusual difficulties are likely to be encountered in the management of this

class action. The purpose of the class action mechanism is to permit litigation against

wrongdoers even when damages to individual plaintiffs may not be sufficient to justify

individual litigation. Here, the damages suffered by Plaintiffs and the Class are relatively small

compared to the burden and expense required to individually litigate their claims against

Defendants, making it impracticable for individual litigation to redress Defendants' wrongful

conduct. Individual litigation by each Class Member would also strain the court system.

Individual litigation creates the potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. Common issues in this litigation also predominate over individual issues because the issues enumerated in the allegations about commonality are more important to the resolution of this litigation than any individual issues.

## COUNT ONE — UNJUST ENRICHMENT

### (On Behalf of the Class Against Defendant)

91.     Plaintiffs repeat and reallege all allegations contained elsewhere in this complaint as if fully set forth herein.

92.     NSSF received Plaintiffs' personal information and used it for political purposes—and benefited from doing so.

93.     NSSF unjustly did not pay Plaintiffs for the receipt and use of their personal information because Plaintiffs had no knowledge of, and did not authorize, NSSF's receipt or use of Plaintiffs' personal information for political purposes.

94.     The failure of NSSF to pay Plaintiffs for use of their personal information was to Plaintiffs' detriment.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of members of the Class as applicable, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

1.     That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' Counsel to represent the defined Class;

2.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of its unlawful acts;

3.      That the Court declare that Defendant acted contrary to law and was unjustly enriched;

4.      That the Court award punitive or exemplary damages, to the extent permitted by law;

5.      That the Court award to Plaintiffs reasonable attorneys' fees, costs, and expenses;

6.      That the Court award prejudgment and postjudgment interest at the maximum applicable rate; and

7.      That the Court grant all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

In an abundance of caution, Plaintiffs demand a jury trial on all claims so triable.

By /s/ Riley Breakell

Riley Breakell (ct31733)
MOTLEY RICE LLC
20 Church Street, 17th Floor
Hartford, CT 06103-1200
Telephone: (860) 218-2727
Fascimile: (860) 882-1682
rbreakell@motleyrice.com


Benjamin Gould (pro hac vice pending)
bgould@kellerrohrback.com
Nicandro Iannacci (pro hac vice forthcoming)
niannacci@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
Telephone:  (206) 623-1900
bgould@kellerrohrback.com
niannacci@kellerrohrback.com


***Attorneys for Plaintiffs***